**FEDERAL DEPOSIT INSURANCE COR-PORATION, as Receiver of New Bank of New England, N.A., Plaintiff, Appellee,**

v.

**Donald L. LeBLANC and LeBlanc Associates, Inc., Defendants, Appellants.**

No. 95–1641.

United States Court of Appeals,
First Circuit.

Heard Nov. 6, 1995.

Decided June 6, 1996.

Robert B. Fredericks, Falmouth, MA, for appellants.

Lawrence H. Richmond, Washington, DC, with whom Ann S. DuRoss and Colleen B. Bombardier were on brief, for appellee.

Before SELYA, Circuit Judge, BOWNES, Senior Circuit Judge, and BOUDIN, Circuit Judge.

BOWNES, Senior Circuit Judge.

This appeal concerns federal banking law and the scope of the federal estoppel doctrine established by the Supreme Court's decision in *D'Oench, Duhme & Co. v. FDIC*, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942), and 12 U.S.C. § 1823(e). Defendant-appellant Donald L. LeBlanc seeks review of the district court's order granting the FDIC's motion for summary judgment. The district court held that the defenses and counterclaims LeBlanc raised in response to the FDIC's affirmative suit to recover the deficiency owed on a mortgage note he and his company, LeBlanc Associates, (collectively "LeBlanc") executed on January 5, 1989, were barred by both Massachusetts law and the *D'Oench* doctrine. We affirm this decision, but on slightly different grounds than those articulated by the district court. Title 28 U.S.C. § 1291 provides jurisdiction.

## I.

### BACKGROUND

For the purpose of reviewing the district court's grant of summary judgment, we summarize the facts in the light most favorable to the nonmoving party. *Levy v. FDIC*, 7 F.3d 1054, 1056 (1st Cir.1993). In 1987, appellant acquired the 54–acre parcel at issue in this case. The parcel, which is located in Falmouth, Massachusetts, and abuts a 900–acre, partially-completed, residential community called Falmouth Woods, is accessible by only one road, Falmouth Woods Road. Though appellant purchased the parcel without first obtaining a right of way over Falmouth Woods Road, his intent was ultimately to acquire such an easement and to develop his parcel into a six-lot, multifamily subdivision called Prospect Hills. At the time LeBlanc purchased the property, both the Falmouth Woods development and Falmouth Woods Road, which fronts the LeBlanc parcel's western boundary, were owned by the Falmouth Woods Development Corporation ("FWDC"), a Massachusetts corporation.

On January 5, 1989, to finance development of the Prospect Hills parcel, LeBlanc obtained a $750,000.00 loan from the Bank of New England South, N.A., which later merged into Bank of New England, N.A. ("BNE"). The loan, which both parties agree was not conditioned upon LeBlanc's acquiring an easement across Falmouth Woods Road, was secured by a personal guaranty note executed by LeBlanc and a mortgage on the 54–acre parcel. Payment on the note was to be monthly, beginning in February of 1989, with the provision that the principal balance, plus accrued and unpaid interest, were to be paid by January 4, 1992.

LeBlanc obtained approval and a permit for the Prospect Hills subdivision from the Falmouth Planning Board and, in the Fall of 1989, began meeting with FWDC to discuss securing access rights over Falmouth Woods Road. During negotiations, FWDC verbally agreed to grant LeBlanc an easement for utilities and right of way across Falmouth Woods Road. A written agreement regarding the easement, however, was never prepared. Before the sale of the easement could be

recorded, FWDC began experiencing financial difficulties and filed for Chapter 11 bankruptcy in March of 1990.

BNE, which had loaned FWDC $28 million prior to extending LeBlanc the loan to develop Prospect Hills and, as a result, held a mortgage in the Falmouth Woods property, sought and obtained relief from the automatic stay placed on FWDC's estate as a result of the bankruptcy filing. BNE operated the Falmouth Woods property as a mortgagee in possession, briefly continuing service at the Falmouth Woods golf course, and tried to sell Falmouth Woods subdivision lots. It eventually foreclosed its mortgage and purchased the property at the subsequent foreclosure sale. Because FWDC's mortgage did not include the fee interest in Falmouth Woods Road, the foreclosure sale purchase left BNE with title to Falmouth Woods and an easement over Falmouth Woods Road. The fee interest in the road remained with the bankruptcy trustee assigned to manage FWDC's assets.

The Falmouth Woods property changed hands several times after BNE's foreclosure-sale purchase, thwarting LeBlanc's efforts to obtain an easement over Falmouth Woods Road. In September 1990, BNE transferred the Falmouth Woods property to its wholly-owned subsidiary, Falmouth Land Company ("FLC"). In January 1991, the Comptroller of the Currency of the United States of America ("COC") declared BNE insolvent and appointed the FDIC receiver of BNE. The COC also chartered the New Bank of New England, N.A. ("NBNE"), pursuant to 12 U.S.C. § 1821(n), as a bridge bank to acquire the assets formerly held by BNE. Thus, NBNE held title to the FWDC property, as well as LeBlanc's $750,000.00 note and guaranty from January to July of 1991.

On July 13, 1991, the COC dissolved NBNE and appointed the FDIC as receiver of the bank, pursuant to 12 U.S.C. § 1821(n)(12). The FDIC then acquired Falmouth Woods and assumed the note and the mortgage on the LeBlanc parcel. On August 13, 1991, the FDIC took title to the fee interest in Falmouth Woods Road in the name of FLC, the NBNE subsidiary. NBNE had purchased the fee interest in Falmouth Woods Road from the FWDC's bankruptcy trustee in May 1991.

LeBlanc pursued his easement request with each of Falmouth Woods's owners because the Prospect Hills parcel, initially appraised at $1,980,000.00, was virtually worthless without access to Falmouth Woods Road. Negotiations with BNE, FLC, and Oak Tree Capitol ("Oak Tree"), a company which functioned as asset manager for both FLC and BNE, were unsuccessful. Attempts to obtain a right of way from NBNE and the FDIC were also unsuccessful, primarily because both entities engaged in actions which blocked LeBlanc's acquisition efforts. NBNE contested LeBlanc's efforts to resolve his road access problems through direct negotiations with the FWDC bankruptcy trustee and was ultimately successful in outbidding LeBlanc for the fee interest in Falmouth Woods Road. According to LeBlanc, NBNE officials also misrepresented the fact that they were marketing the Falmouth Woods property without reservation of rights or notice of claims. LeBlanc further asserts that NBNE attempted to accelerate payment on his note by declining to honor a loan commitment made to another LeBlanc development entity, DDM Development Corporation ("DDM"), and making an easement across Falmouth Woods Road contingent upon increased collateralization of the note or a reduction in principal. LeBlanc imputes a similar bad intent to the FDIC, which failed to convey him an easement during work-out negotiations on the note.

Payments on LeBlanc's $750,000.00 note were current and regular until the Fall of 1991. Then, in a November 13, 1991, letter, LeBlanc informed the FDIC, which held title to Falmouth Woods and Falmouth Woods Road at that time, that its refusal to convey the requested easement entitled him to discontinue payments on the $750,000.00 note and that he would not resume payments until the easement matter was resolved. On November 21, 1991, the FDIC made a demand for full payment of the outstanding note balance. When LeBlanc failed to make the requested payment, the FDIC, on August 7, 1992, foreclosed and sold the Prospect Hills

property for $235,000.00 at auction. Appellant's son, Mark LeBlanc, as Trustee of the McAuliffe Nominee Trust, purchased the property. The deficiency due on LeBlanc's note, the subject of the instant appeal, has not yet been paid.

## II.

### *PROCEDURAL HISTORY*

On June 19, 1992, the FDIC filed an action in the District Court for the District of Massachusetts, seeking the deficiency balance on LeBlanc's note. On August 21, 1992, Le-Blanc filed an answer and three count counterclaim, alleging that the FDIC's refusal to grant LeBlanc an easement across Falmouth Woods Road violated state law. Count I of the counterclaim alleged that the FDIC's actions breached the implied covenant of good faith and fair dealing implicit in all contracts made under Massachusetts law. *See* Mass. Gen. L. ch. 106 § 1–203 (1990). Count II alleged a breach of contract under Mass. Gen. L. ch. 106 § 9–106, which governs secured transactions. Count III raised claims in tort for intentional infliction of emotional distress.

On February 17, 1993, before a magistrate judge, the FDIC moved for judgment on the pleadings, pursuant to Fed.R.Civ.P. 12(c), and argued that the federal estoppel doctrine established by the Supreme Court's decision in *D'Oench, Duhme & Co. v. FDIC*, 315 U.S. at 447, 62 S.Ct. at 676, and 12 U.S.C. § 1823(e) barred LeBlanc from asserting his defenses and three counterclaims. LeBlanc contended that neither section 1823(e) nor the common law *D'Oench* doctrine it codifies preempted his counterclaims. He maintained that, under Massachusetts common law and the Uniform Commercial Code ("UCC"), the duties allegedly breached by the FDIC arose out of the performance and administration of the note and not out of an unauthorized side agreement.

In a May 13, 1993, order, the magistrate judge allowed, in part, and denied, in part, the FDIC's Rule 12(c) motion. The court found that the principal allegations raised by LeBlanc's counterclaims rested on an "implied" and, under the *D'Oench* doctrine, un-

enforceable "agreement that the FDIC affirmatively assist LeBlanc ... in [his] attempt to acquire a right of way over the road." It, therefore, dismissed those allegations in counts I and III of appellant's counterclaim which relied on that agreement, holding that all other allegations, taken as true, were legally sufficient to survive Rule 12(c).

The magistrate judge ruled that count II of appellant's counterclaim, which was based on Mass. Gen. L. ch. 106 § 9–507 and focused on the FDIC's conduct at the August 1991 foreclosure auction, survived the Rule 12(c) motion because, unlike counts I and III, it was based exclusively on state law. She did not, however, attempt to resolve that claim because she found the information available to her insufficient to decide the commercial reasonableness of the FDIC's foreclosure actions. Finally, the magistrate judge rejected the FDIC's claim that a federal common law rule barring LeBlanc's claims should be fashioned. She found that LeBlanc's counterclaim was procedurally deficient because he failed to seek leave to name the FDIC as a counterclaim-defendant in its corporate capacity.

On August 13, 1993, the district court issued an order accepting the Report and Recommendation of the magistrate judge, with two modifications. It dismissed LeBlanc's counterclaims against the FDIC in its corporate capacity and reserved the issue of which party bears the burden of proof on matters of "commercial reasonableness" for later determination. The FDIC filed a motion for summary judgment against LeBlanc on July 22, 1994.

On October 27, 1994, the district court issued an order allowing summary judgment for the FDIC on its affirmative claim for the deficiency due on the note and post-judgment interest. The district court agreed with the magistrate judge's determination that the federal estoppel doctrine barred much of LeBlanc's answer and concluded that "LeBlanc has presented no defense that would excuse his default." The court also granted the FDIC's summary judgment motion with respect to appellant's three-count counterclaim. It reaffirmed the magistrate judge's conclusion that appellant's counterclaims were

barred to the extent that they were based on a side agreement or affirmative duty and, consequently, only considered the state law issues which survived the magistrate judge's order.

Without deciding whether *D'Oench* and section 1823(e) permit claims based on terms implied in an agreement as a matter of state law, the district court held that appellant's allegations, even if true, did not constitute a breach of the implied covenant of good faith and fair dealing. Noting that Massachusetts law does not impose a duty to enter into a contract, the court rejected appellant's claims that it was inappropriate for the FDIC to compete with LeBlanc or to use the fee interest in Falmouth Woods Road as a bargaining chip in its negotiations with appellant.

The court also held that LeBlanc's claim that the FDIC failed to handle its secured collateral, the Prospect Hills parcel, in accordance with Mass. Gen. L. ch. 106 § 9–507, could not stand because that statute does not govern secured transactions where the security is real property. Finally, the district court granted summary judgment on appellant's intentional infliction of emotional distress counterclaim. It concluded that the FDIC's actions did not amount to extreme and outrageous behavior within the meaning of Massachusetts tort law, though it acknowledged that the FDIC's actions in attempting to trade an easement in Falmouth Woods Road "may [have] constitute[d] rather hardnosed business." The court entered its judgment on May 8, 1995, and this appeal followed.

### III.

### DISCUSSION

■ We review the district court's grant of summary judgment *de novo, EEOC v. Green,* 76 F.3d 19, 23 (1st Cir.1996), but may affirm on any independently sufficient ground. *Mesnick v. Gen. Elec. Co.,* 950 F.2d 816, 822 (1st Cir.1991), *cert. denied,* 504 U.S. 985, 112 S.Ct. 2965, 119 L.Ed.2d 586 (1992); *see also* Fed.R.Civ.P. 56(c). We do not consider the issues presented by appellant's intentional infliction of emotional distress and

Mass. Gen. L. ch. 106, § 9–507 counterclaims. Appellant failed to heed our oft-articulated warning that "issues averted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, [will be] deemed waived for purposes of appeal." *Grella v. Salem Five Cent Sav. Bank,* 42 F.3d 26, 36 (1st Cir.1994); *see also Executive Leasing v. Banco Popular De Puerto Rico,* 48 F.3d 66, 68 (1st Cir.)(On appeal, "[w]e will not rely upon arguments and allegations that are developed only in the district court pleadings."), *cert. denied,* —— U.S. ——, 116 S.Ct. 171, 133 L.Ed.2d 112 (1995).

■ Nor do we consider those counterclaim I issues which the district court held hinged on an affirmative obligation or implied agreement that the FDIC assist appellant in obtaining a right of way over Falmouth Woods Road. Appellant did not object to the magistrate's decision and, therefore, waived his right to appeal the district court's order on this question. *See Henley Drilling Co. v. McGee,* 36 F.3d 143, 150–51 (1st Cir. 1994); *see also* 28 U.S.C. § 636(b)(1)(C); Fed.R.Civ.P. 72(b). We concern ourselves solely with LeBlanc's defense to the FDIC's affirmative claims and those counterclaim I arguments which the district court held survived *D'Oench* and section 1823(e). For the sake of convenience, we use "FDIC" to refer to both the FDIC in its capacity as receiver and its predecessors in interest.

### *LeBlanc's Defense to the FDIC's Affirmative Claims*

The district court granted summary judgment on the FDIC's claim for the deficiency due on the $750,000.00 note and entered judgment in favor of the FDIC in the amount of $686,942.78, plus post-judgment interest. On appeal, LeBlanc argues that the district court erroneously held that *D'Oench* and section 1823(e) barred his defense that the FDIC, as receiver of NBNE, breached its obligation to perform the terms of the loan agreement in good faith, *see* Mass. Gen. L. ch. 106 § 1–203, by competing with him for the fee interest in Falmouth Woods Road. He contends that his defense of economic coercion concerns the value of the $750,000.00

note and not his failed attempts to secure a right of way.

On this point, we discern no error in the district court's analysis. Without deciding whether breach of implied covenant of good faith and fair dealing claims are generally precluded by *D'Oench*, we hold that the particular defense advanced in this case is barred. Appellant's defense rests on an unwritten or implied agreement regarding a right of way over Falmouth Woods Road and not the terms of the $750,000.00 note.

 The common law *D'Oench* doctrine "prevents plaintiffs from asserting as either a claim or defense against the FDIC oral agreements or 'arrangements.'" *Adams v. Zimmerman*, 73 F.3d 1164, 1168 (1st Cir.1996)(quoting *Timberland Design, Inc. v. First Serv. Bank for Sav.*, 932 F.2d 46, 48–50 (1st Cir.1991)). Its statutory codification, section 1823(e), "bars anyone from asserting against the FDIC any 'agreement' that is not in writing and is not properly recorded in the records of the bank." *Id.; see also* 12 U.S.C. § 1823(e). Section 1823(e), as amended by the Financial Institutions Reform, Recovery, and Enforcement Act (FIRREA), provides:

> No agreement which tends to diminish or defeat the interest of the Corporation in any asset acquired by it under this section or section 1821 of this title, either as security for a loan or by purchase or as receiver of any insured depository institution, shall be valid against the Corporation unless such agreement—(1) is in writing, (2) was executed by the depository institution and any person claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the depository institution, (3) was approved by the board of directors of the depository institution or its loan committee, which approval shall be reflected in the minutes of said board or committee, and (4) has been, continuously, from the time of its execution, an official record of the depository institution.

12 U.S.C. § 1823(e). Though there is some disagreement as to whether *D'Oench* and section 1823(e) should be read as coextensive, *see Adams*, 73 F.3d at 1168–69 n. 2, all courts agree that they serve the same purpose: to "prohibi[t] all secret agreements that tend to make the FDIC susceptible to fraudulent arrangements." *Timberland Design, Inc. v. First Serv. Bank for Sav.*, 932 F.2d 46, 48 (1st Cir.1991).

 The scope of agreements precluded by *D'Oench* and section 1823(e) is expansive. *See Adams*, 73 F.3d at 1169. It includes promises to perform, as well as fraudulent misrepresentations or warranties, whether the FDIC had knowledge of the fraud or misrepresentation at the time it acquired the asset or not. *Langley v. FDIC*, 484 U.S. 86, 91–94, 108 S.Ct. 396, 401–03, 98 L.Ed.2d 340 (1987). Additionally, it embraces both affirmative claims and defenses and extends to arguments asserted in terms of contract or tort. *Timberland*, 932 F.2d at 49–50.

 LeBlanc's main attack is based on the FDIC's failure to actively assist him in obtaining a Falmouth Woods Road easement upon taking control of BNE's assets. The problem with this is that nothing in the terms of the $750,000.00 note can be read to create such a duty on the part of the FDIC. LeBlanc, in fact, admits that the $750,000.00 note was contingent neither upon his obtaining nor the FDIC or its predecessors providing an easement. Accordingly, this attempt to shift the risk LeBlanc knowingly assumed when he purchased the land-locked Prospect Hills property to the FDIC, and consequently, to unsuspecting creditors and depositors, must fail. *See Timberland*, 932 F.2d at 48. Permitting appellant to proceed on the basis of an unrecorded agreement would undermine the accuracy of NBNE's records and further complicate the FDIC's task of valuing NBNE's assets. *Compare Desmond v. FDIC*, 798 F.Supp. 829, 839 (D.Mass.1992); *see also Langley*, 484 U.S. at 92, 108 S.Ct. at 401–02.

### *LeBlanc's Counterclaim for Breach of an Implied Covenant of Good Faith and Fair Dealing*

LeBlanc avers that the FDIC, as receiver of NBNE, breached its obligation to perform the terms of the $750,000.00 loan agreement in good faith in three regards. He contends that the FDIC deprived him of the fruits of

his bargain, *see Anthony's Pier Four, Inc. v. HBC Assoc.*, 411 Mass. 451, 471, 583 N.E.2d 806 (1991), by withholding funds due him on the DDM construction project and by making an easement across Falmouth Woods Road contingent upon provision of additional collateral or a reduction in note principal and utilizing artificially low appraisals of the Prospect Hills development. He also alleges that the FDIC's failure to extend him an easement across Falmouth Woods Road during work-out negotiations constitutes a breach of the agreement.

 There is an argument that *D'Oench* precludes these claims, at least to the extent that they rely upon any specifics in the negotiations between the borrower and the bank, even if the specifics are not formally agreements. *See Langley*, 484 U.S. at 91–94, 108 S.Ct. at 401–03. But even if we assume that *D'Oench* does not bar LeBlanc's breach of an implied covenant of good faith and fair dealing counterclaims—and, as we indicated in the previous section, we are certainly not deciding that question here—appellant has not convinced us that there is any general obligation under state law that required the bank (in the absence of an agreement) to take the affirmative steps appellant now claims should have been taken.

We detect no bad faith in the FDIC's decision to withhold DDM project funds or to make an easement across Falmouth Woods Road contingent upon additional collateral or a reduction in principal. Though the FDIC's dealings with LeBlanc were arguably "hard-nosed," there is no evidence that the FDIC's actions deprived LeBlanc of the benefits of the loan agreement. *See Anthony's Pier*, 411 Mass. at 471, 583 N.E.2d 806. LeBlanc neither disputes that he received the proceeds of the $750,000.00 loan nor suggests that the FDIC took adverse actions on the note before his November 1992 default.

LeBlanc's arguments are complaints about the terms on which the FDIC proposed to execute or continue agreements with him. But having engaged in rigorous bargaining of his own, LeBlanc cannot now contend that it was unfair for the FDIC to bargain for more security on the $750,000.00 note. The FDIC had no duty at all under the loan agreement to extend appellant an easement, let alone to provide him one on terms which were more favorable to him. Nothing prevents a party to a bargain from engaging in hard-nosed dealings, *see Schwanbeck v. Federal–Mogul Corp.*, 31 Mass.App.Ct. 390, 405, 578 N.E.2d 789 (1991), *rev'd on other grounds*, 412 Mass. 703, 706, 592 N.E.2d 1289 (1992), or even from attempting to capture opportunities foregone at the formation of one contract—i.e., the loan agreement—by negotiating another—i.e., the easement. *See* Burton, *Breach of Contract and the Common Law Duty to Perform in Good Faith*, 94 Harv. L.Rev. 369, 372–73 (1980). As the district court astutely observed, "the FDIC owned something that LeBlanc wanted, and it was permissible for the FDIC to use that 'something' as a bargaining chip in order to obtain what it wanted, namely more security on the $750,000.00 note."

 Finally, we reject LeBlanc's claim that the FDIC breached its obligation to perform in good faith during work-out negotiations with appellant. Massachusetts law implies a duty of good faith and fair dealing in every existing contract. *See Anthony's Pier*, 411 Mass. at 472, 583 N.E.2d 806; *Fortune v. Nat'l Cash Register Co.*, 373 Mass. 96, 364 N.E.2d 1251 (1977); *Schwanbeck*, 31 Mass.App.Ct. at 397 n. 6, 578 N.E.2d 789. At the time the work-out negotiations occurred, however, there was no contract between the FDIC and LeBlanc. LeBlanc's November 1992 default ended the contractual relationship he theretofore enjoyed with the FDIC. We, therefore, hold that LeBlanc's claim fails to the extent that it relies on the loan agreement. That claim also fails to the extent that it rests on an obligation to negotiate new contracts in good faith. We are not convinced that the loan agreement contained any such contractual obligation, *see Schwanbeck v. Federal–Mogul Corp.*, 412 Mass. 703, 706, 592 N.E.2d 1289 (1992), and do not find, for that matter, any evidence that the FDIC entered into work-out negotiations with an ulterior purpose or bad motives.

## IV.

### CONCLUSION

For the foregoing reasons, we affirm the district court's grant of summary judgment.

The judgment sum of the district court is affirmed. There will be added to that sum, $686,942.78, such post-judgment interest as is due.